**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CRIMINAL ACTION NO.** |
| **Plaintiff,** | **1:19-CR-389-LMM-CCB-17** |
| **v.** | |
| **NICHOLAS CHARLES JOHNSON,** | |
| **Defendant.** | |

## ORDER AND FINAL REPORT AND RECOMMENDATION

Defendant Nicholas Charles Johnson is charged with conspiring to distribute methamphetamine (Count 1) and possessing with the intent to distribute methamphetamine (Count 10). (Doc. 231). The matter is now before the Court for consideration of his motion to suppress statements, (Doc. 626), and his motion for a bill of particulars, (Doc. 625). The Court held an evidentiary hearing on February 15, 2022, (Docs. 669, 672), Defendant filed a post-hearing brief in support of the motion to suppress, (Doc. 681), and the Government filed an omnibus response to both motions, (Doc. 695). Defendant did not file a reply, and the matter is now ripe for review. For the reasons set forth below, the motion for a

bill of particulars is **DENIED**, and I recommend that the motion to suppress be

**DENIED**.

I.      **Facts**

Law enforcement agents executed a federal search warrant at 8917 Sterling

Ridge Lane in Jonesboro, Georgia, in the early morning hours of August 6, 2019.

(Doc. 672 at 9, 30).[1] Defendant was at the residence, along with a woman and a

child. *Id.* at 10. Agents knocked on the door of the house, the occupants were taken

outside, and agents conducted a search of the location. *Id.* at 10–11. DEA Task

Force Officer Chase Thomas participated in that search and, when he was done,

he went outside to speak with Defendant. *Id.* at 14.

Officer Thomas spoke with Defendant outside the home. *Id.* at 14–16.

Defendant was handcuffed, but, at that time, he was not under arrest. *Id.* at 14.

Thomas introduced himself and then advised Defendant of his *Miranda* rights. *Id.*

at 14, 16–17. Thomas did not read the warnings from a card or form, but rather

recited them from memory, and he repeated those warnings (again from memory)

at the hearing. *Id.* at 16–17, 30. He told Defendant: "You have the right to remain

---

[1] Law enforcement observed Defendant at that address on July 21, 2019, after an undercover agent bought drugs from him earlier in the day. (Doc. 672 at 8–9).

silent. Anything you say can and will be used against you in a court of law. You have the right to an attorney. If you cannot afford an attorney, one will be provided to you. Do you understand these rights as I have explained them to you?" *Id.* at 30. Officer Thomas testified that Defendant indicated that he understood his rights, waived his rights, agreed to speak, made "a couple of statements" about firearms that were found in the house, and then said that he thought that maybe he needed a lawyer. *Id.* at 17, 30. At that time, the officer stopped questioning Defendant, and he was placed under arrest. *Id.* at 17. All told, the interview lasted three to five minutes. *Id.* at 34.

Defendant did not express any confusion or difficulty in understanding Officer Thomas. *Id.* at 15. He was calm, uninjured, and he gave no indication that he was in any distress. *Id.* at 16. The officer did not threaten Defendant, nor did he make him any promises. *Id.* at 16, 18. Officer Thomas was armed, but he did not remove his weapon from its holster at any time during his interview with Defendant. *Id.* at 31. Nor did any of the other officers have their weapons out during the interview. *Id.* at 32.

Officer Thomas is familiar with the forms that some law enforcement agents use to document that a suspect has been advised of his *Miranda* warnings and wishes to waive those rights. *Id.* at 20. Indeed, he "probably" had such a form with

3

him on the day of the interview, but he did not use it because it is "not required." *Id.* Nor did the officer record his conversation with Defendant. *Id.* at 21–22. Thomas testified that there were other law-enforcement personnel present when he warned Defendant of his *Miranda* rights, but he could not remember who. *Id.* at 25–26, 31.

## II.    Analysis

### A.    Motion to Suppress Statements

Defendant argues that the officer's testimony regarding the *Miranda* warnings and waiver is not credible. (Doc. 681 at 3–5). Specifically, he contends that Officer Thomas remembered "nothing" about what happened on the day of the interview, except for the details surrounding the *Miranda* warnings and waiver, which he remembered with clarity. *Id.* This, Defendant argues, along with Thomas's "sarcastic and dismissive" demeanor at the hearing, is sufficient for the Court to find that the officer is not credible. *Id.* at 4. Defendant additionally suggests that his waiver was neither knowing nor voluntary, *id.* at 2, but he does not further develop this argument in his brief. The Government responds that, although there are certain facts that Thomas cannot recall, he remembers the important aspects of the interview with Defendant, and his testimony is credible. (Doc. 695 at 10–11). The Government disputes the notion that the officer was

4

sarcastic, dismissive, or that he was attempting to obfuscate the proceedings. *Id.* at 11. And finally, the Government argues that the statements were voluntary. *Id.* at 11–12.

The Fifth Amendment requires courts to "exclude from evidence any incriminating statements an individual makes before being warned of his rights to remain silent and to obtain counsel." *United States v. Luna-Encinas*, 603 F.3d 876, 880 (11th Cir. 2010). The entitlement to *Miranda* warnings, however, "attaches only when custodial interrogation begins." *Id.* (internal quotation marks omitted). Interrogation, for purposes of *Miranda*, includes "express questioning" as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980) (footnote omitted). The Government bears the burden of demonstrating that a defendant has waived his *Miranda* rights "only by a preponderance of the evidence." *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *United States v. Bernal-Benitez*, 594 F.3d 1303, 1318 (11th Cir. 2010) ("The Government must prove by a preponderance of the evidence that the defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights."). "A preponderance of the evidence is evidence which is more convincing than the

evidence offered in opposition to it." *United States v. Watkins*, 10 F.4th 1179, 1184–85 (11th Cir. 2021) (*en banc*) (internal quotation marks omitted) (further noting that a preponderance is "proof that persuades the trier of fact that a proposition is more likely true than not true" (internal quotation marks omitted)).

Neither of the parties argue about the "custodial" or "interrogation" portions of the inquiry—the only question is whether Officer Thomas actually informed Defendant of his *Miranda* rights and whether Defendant waived those rights.

For starters, the Court notes that Officer Thomas's testimony—that he advised Defendant of his *Miranda* rights, that Defendant waived those rights, and that Defendant agreed to speak (at least initially, prior to stating that he might want a lawyer)—is uncontradicted; there is no evidence to suggest that something different happened. Instead, Defendant's argument is that Thomas's testimony, although unrebutted, is simply not credible. Defendant argues that Thomas remembers "nothing" about the relevant day other than the critical facts about the *Miranda* warnings and waiver. (Doc. 681 at 3–5). He notes that Thomas could not remember how many other officers were present, who was with him when he spoke with Defendant, how many law-enforcement vehicles were at the scene, what Defendant was wearing, where the woman or child were during the

conversation, whether the woman was handcuffed, or whether the door to the house was breached or opened voluntarily. *Id.* at 3.

Officer Thomas's memory—while not crystal clear—is not as bad as Defendant suggests. The officer remembers the date and location of the search, that Defendant came to the door with a Hispanic female and child, and that everyone was taken outside to the right side of the house. (Doc. 672 at 9–11). He described how the agents searched the house. One group did an initial sweep looking for other people or dangers. *Id.* at 11. The agents then photographed the house, assigned two members per room, and searched. *Id.* at 11–12. He remembers that agents found firearms and ammunition in a particular bedroom, and he testified that agents knew that Defendant was on felony probation at the time of the search (and was therefore prohibited from possessing guns). *Id.* at 12–13. He also remembers documents agents found with Defendant's name, as well as suspicious tires (with rectangular cutouts and insulation that he believed were indicative of narcotics trafficking) that were located in the garage. *Id.* at 13. And, as noted above, Thomas remembers the words he used to convey Defendant's *Miranda* warnings and that Defendant waived his rights and made a few statements before expressing interest in a lawyer. *Id.* at 14–17. He remembers that Defendant was handcuffed, that he was outside, that Defendant was initially

7

standing but may have sat down for a moment, that Defendant was calm and uninjured, and that the conversation lasted for three to five minutes before Defendant made the comment about possibly wanting a lawyer. *Id.* at 15–16, 34.

To be sure, there are facts that Thomas does not remember. He does not remember, for example, whether the agents breached the door to the house or whether Thomas opened it voluntarily. *Id.* at 10. He could not remember exactly how many officers were on the scene, or how many vehicles they traveled in. *Id.* at 22–23. Nor does he remember whether the woman was handcuffed or what Defendant was wearing. *Id.* at 24, 31. Officer Thomas knows that there were other agents present during his conversation with Defendant, but he does not remember who they were. *Id.* at 25–26, 31.

Having observed Defendant testify at the hearing, I find his testimony credible. He remembers key components of the day, including when and where the search warrant was executed, where Defendant was taken for the interview, whether Defendant was handcuffed, what he told Defendant about his *Miranda* rights, what Defendant said in response, how long the interview lasted, Defendant's demeanor, and what caused the interview to end. And although there are things that Thomas does not remember, his lack of memory is not significant enough for the Court to find him incredible. Some of the things that he does not

remember (for example, the number of vehicles the officers used to travel to the house) are insignificant and not things I would necessarily expect an officer to remember two-and-a-half years after the fact. For other facts, he offers rational explanations for his lack of memory. For example, he does not remember whether the woman in the house was handcuffed, but he explained that he did not have "any dealings" with her or the child. *Id.* at 18. Even the most important fact that Thomas does not remember—the names of the other officer or officers who were with him when he spoke with Defendant—comes with a plausible explanation. He testified that that the interview lasted less than five minutes and that other officers stepped in and out during that short time. *Id.* at 34. All told, Officer Thomas remembers the key events of the day, and the fact that he does not remember certain components of his interaction with Defendant is not sufficient for me to discredit his testimony in its entirety.

That leaves Defendant's argument that Thomas was sarcastic, dismissive, hostile, and obfuscating at the evidentiary hearing. (Doc. 681 at 3–4). I do not agree with that characterization. The officer readily admitted the things he did not remember. (*See, e.g.*, Doc. 672 at 10 ("We did a knock and announce at the door. This particular search warrant, I don't remember if Mr. Johnson came directly to the door or if it was breached, but he eventually did come to the door with another

Hispanic female and a younger child.")). And I got no sense at all, as Defendant argues, that Thomas's testimony "appeared to be deliberately designed to obfuscate the proceedings." (Doc. 681 at 4). There are some things that he does not remember, but there was nothing in his testimony that suggested to me that he was *deliberately* trying to make the proceedings unclear or confusing.

That being said, there is one component of the testimony that I find off-putting and worthy of mention. Officer Thomas testified that he did not use a written *Miranda* waiver, even though he probably had one with him at the scene in his truck. (Doc. 672 at 20). That decision was a poor one. In this day and age, it is hard to imagine a good reason not to use a written *Miranda* waiver form (particularly at an operation like this one, which was planned in advance), and Thomas did not provide such a reason at the hearing. Instead, he simply and repeatedly stated that such a form is not required:

> Q:    So you knew that you were going to be at this location and that you were supposed to try to interview Mr. Johnson?
>
> A:    Correct.
>
> Q:    And that was your task?
>
> A:    Correct.
>
> Q:    Knowing that, you did not bring the advice of rights form to be signed, to have Mr. Johnson sign it?

10

A:     No, ma'am.

Q:     And nor—and why not?

A:     They're not required.

Q:     But you would agree that it's better practice to have someone sign the document so it's clear that they have actually read their rights?

A:     I'll agree that they're not required for us to have someone sign that.

Q:     That wasn't my question, though. I'm sorry.

A:     What was your question?

Q:     You would agree that it's better practice to actually have the person sign the Miranda advice rights form?

A:     It depends on the circumstance.

Q:     Like what?

A:     This circumstance I chose not to have him sign.

Q:     I'm sorry?

A:     I'm not required to have him sign that form. If he acknowledges that he understands what I'm saying, it's not required.

(Doc. 672 at 20–21). To be sure, a written form is *not* required. *See, e.g.*, *United States v. Lewis*, No. 1:18-CR-369-WMR-JFK, 2019 WL 7503156, at *14 (N.D. Ga. Oct. 1, 2019) ("A written waiver of rights form is not required to establish that a defendant

11

knowingly, intelligently and voluntarily waived his *Miranda* rights."), *adopted by* 2019 WL 6907509 (N.D. Ga. Dec. 19, 2019). But it is "strong evidence that the defendant waived his rights." *Bernal-Benitez*, 594 F.3d at 1319. And it would be especially so in a case like this, where the officer did not otherwise record the interview.

Nor is using a written form particularly burdensome on an officer (again, especially in the context of a preplanned interview—the analysis might be different, for example, in the context of a spontaneous traffic stop). Indeed, Officer Thomas testified that he probably had a form in his truck—he just decided not to use it because he was not required to do so. And when pressed at the hearing about whether using a written waiver form is the "better practice," he would say only that it depends on the circumstance—yet could not identify a circumstance when using a form would not be a wise choice. (Doc. 672 at 21). This case was made harder by the officer's decision not to use a waiver form, and his explanation for why (that the law does not require it) is unsatisfying. Nevertheless, his testimony is credible and unrebutted, and I find that Defendant was properly advised of his *Miranda* rights and nevertheless elected to speak with the officer.

Defendant mentions in passing that his statements were not voluntary, (Doc. 681 at 2), but he does not expand on that argument or explain why. A court

looks at the totality of the circumstances when evaluating voluntariness, and the question ultimately is whether the defendant's statement "was the product of an essentially free and unconstrained choice." *Hubbard v. Haley*, 317 F.3d 1245, 1252 (11th Cir. 2003) (internal quotation marks omitted). Among the factors a court should consider "are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." *Id.* at 1253.

"Those cases where courts have found confessions to be involuntary have contained a substantial element of coercive police conduct." *United States v. Patterson*, No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *4 (N.D. Ga. Aug. 10, 2007) (internal quotation marks omitted). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." *United States v. Thompson*, 422 F.3d 1285, 1295–96 (11th Cir. 2005) (internal quotation marks omitted).

Here the factors weigh in favor of finding that Defendant's statements were voluntary. The length of the detention (even including the time he was detained

13

prior to the interview) was short[2] and the interview itself was only three to five minutes. (Doc. 672 at 34). The officer did not physically or emotionally threaten Defendant, he did not offer him any promises, and although armed, he never removed his gun from his holster. *Id.* at 16, 31. Defendant was calm and did not indicate that he was in any distress. *Id.* at 16. With those facts, and with no suggestion from Defendant about why his statements were involuntary, the Court finds that Defendant's statements were voluntary.

### B.   Motion for a Bill of Particulars

Defendant is charged in Count One of the superseding indictment with conspiring to knowingly and intentionally possess with the intent to distribute at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. § 846. (Doc. 231). The superseding indictment states that the conspiracy began by at least April of 2019 and continued

---

[2] The officer initially stated that the search warrant was executed at 7:10 a.m. and that he began the interview at approximately 7:30—suggesting that Defendant was detained for about 20 minutes prior to the interview. (Doc. 672 at 25). He later agreed, however, that the warrant was executed at 6:10 a.m. *Id.* Although the question was not asked, the Court presumes that Thomas would have likewise corrected his testimony about when the interview began to approximately 6:30 a.m. Nevertheless, whether twenty minutes or an hour and twenty minutes, the Court does not find that the time Defendant was detained weighs in his favor—particularly when the interview itself lasted less than five minutes.

14

until at least September 10, 2019. *Id.* at 2. It identifies 16 co-conspirators by name and alleges that there are others as well, "both known and unknown to the Grand Jury." *Id.* Defendant is also charged in Count Ten, which charges that he and three named co-defendants, along with others known and unknown to the grand jury, aided and abetted by each other, possessed with the intent to distribute at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine on July 30, 2019, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). (Doc. 231 at 16–18).

Defendant moves for a bill of particulars. (Doc. 625). He argues that the Government should be required to outline the following:

- His alleged role as a drug supplier, distributer, and/or courier for the co-conspirators;

- His alleged agreement to join the conspiracy, including the dates and times he formed an agreement and acted in furtherance of the conspiracy;

- How he aided and abetted the three co-defendants identified in Count Ten;

- His alleged role "on any other day or in any other aspect of this conspiracy"; and

- The names of all of the unindicted co-conspirators.

(Doc. 625 at 3–4). In short, Defendant seeks a detailed list of everything he is alleged to have done in furtherance of the conspiracy, the names of everyone involved, and particulars for how is alleged to have engaged in the substantive crime charged in Count Ten. *Id.*

The Government argues that the information contained in the indictment, along with what it has provided in discovery, is "more than sufficient" to allow Defendant to prepare his defense, minimize any surprise at trial, and plead against double jeopardy in the future. (Doc. 695 at 6–8). The Government details the discovery it has provided, including law-enforcement reports, search warrants, lab results, cell phone extractions, toll data, text messages, photographs, surveillance video, and Defendant's own criminal history. *Id.* at 2. Specifically, the Government discusses in some detail events that occurred involving Defendant and a host of others (including four co-defendants identified by name) on July 18, 21, and 30, 2019. *Id.* at 2–3. The Government recites facts related to suspected drug transactions that occurred on those dates, all of which involve Defendant, and

maintains that it has produced evidence cataloguing the details of those transactions in the course of discovery. *Id.* Defendant did not file a reply brief.

"The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense." *United States v. Davis*, 854 F.3d 1276, 1293 (11th Cir. 2017) (internal quotation marks omitted). "A bill of particulars may not be used to obtain a detailed disclosure of the government's evidence prior to trial," nor is a defendant entitled to one "where the information sought has already been provided by other sources, such as the indictment and discovery." *Id.* (internal quotation marks omitted). A bill of particulars "is not a general tool of discovery, nor is it a device to give the defense a road map to the government's case." *United States v. Leiva-Portillo*, No. 1:06-CR-350-WSD, 2007 WL 1706351, at *14 (N.D. Ga. June 12, 2007). Instead, a bill of particulars "supplements an indictment by providing the defendant with information *necessary* for trial preparation." *United States v. Anderson*, 799 F.2d 1438, 1441 (11th Cir. 1986) (emphasis in original). It is appropriate where the indictment "fails to set forth specific facts in support of requisite elements of the charged offense, and the information is essential to the defense." *United States v. Cole*, 755 F.2d 748, 760 (11th Cir. 1985). "Courts have

17

routinely denied requests for bills of particulars concerning the 'wheres, whens and with whoms' of the crime." *United States v. Bonventre*, No. 10 Cr. 228(LTS), 2013 WL 2303726, at *6 (S.D.N.Y. May 28, 2013), *aff'd*, 646 F. App'x 73, 78–79 (2d Cir. 2016). Furthermore, "[a] bill of particulars may not be used to compel the government to provide the essential facts regarding the existence and formation of a conspiracy," nor "is the government required to provide defendants with all overt acts that might be proven at trial." *United States v. Rosenthal*, 793 F.2d 1214, 1227 (11th Cir. 1986).

Defendant seeks information that he either already has through discovery or is simply not entitled to obtain through a bill of particulars. His request for all of the acts he undertook, as well as details about the formation and existence of the conspiracy, exceeds the scope of what a bill of particulars is designed to provide. *See id.*; *United States v. Addaquay*, No. 1:20-CR-45-LMM-JSA, 2020 WL 6600021, at *3 (N.D. Ga. July 13, 2020) (denying a request for a bill of particulars for "all relevant actions of all conspirators" and "all specific acts or transactions that [the defendants] are alleged to have committed in furtherance of and during the course of the conspiracy"), *overruling objections to magistrate judge's order*, 2020 WL 4530001 (N.D. Ga. Aug. 6, 2020). And the Government states that it has

provided in discovery the identities of the known unindicted co-conspirators. (Doc. 695 at 8).

Defendant seeks information for how he aided and abetted Sanchez, Ramirez, and Banks (the other defendants named in Count Ten, which charges a substantive crime alleged to have occurred on July 30, 2019). But the Government details specific facts related to that transaction, including the roles of Defendant and each of the other co-defendants identified in that count, which it maintains that it provided in discovery. (Doc. 695 at 3). Indeed, the Government's recitation of facts related to the Count Ten transaction that occurred on July 31, 2019 includes references to specific conversations among the charged defendants, agent observations from surveillance, intercepted wire communications, and a traffic stop—all of which the Government says is within the discovery. *Id.*

All told, the superseding indictment identifies the charged statutes, the dates on which the crimes occurred, and the controlled substances at issue. Between the indictment and the discovery, the Government has identified the names of the known co-conspirators, specific transactions Defendant was involved with, and details regarding the substantive crime charged in Count Ten. Nothing more is required. *See Leiva-Portillo*, 2007 WL 1706351, at * 15 (denying a request for a bill of particulars in similar circumstances). Nor has Defendant explained why

19

he *needs* more information to properly prepare for trial, minimize surprise, or assert double jeopardy in the future. The motion for a bill of particulars, (Doc. 625), is therefore **DENIED**.

### III.   Conclusion

For the reasons stated above, the undersigned **DENIES** Defendant's motion for a bill of particulars, (Doc. 625), and **RECOMMENDS** that Defendant's motion to suppress statements, (Doc. 626), be **DENIED**.

There are no other motions pending related to this Defendant, and his case is now **READY FOR TRIAL**.

**IT IS SO ORDERED AND RECOMMENDED,** this 14th day of September, 2022.

_____
CHRISTOPHER C. BLY
UNITED STATES MAGISTRATE JUDGE